Good morning, Your Honors. Eric Sleptian on behalf of Ms. York-Spann. I'd like to try to reserve three minutes for rebuttal. Could you speak a little bit louder, please? Yes, Your Honor. Your Honor, this is a Social Security disability case, and Ms. York-Spann is challenging the decision of the administrative law judge. There are two bases to vacate a decision of a law judge, and basically the one we're focusing in on is legal error. And that is that there was procedural errors issued in this decision that would require that it be vacated. In particular, a judge is supposed to follow a five-step sequential evaluation process. At Step 2, the LLJ did find that the claimant suffers from severe impairments. We're not challenging the Step 3 finding. The issue that we have concerns Steps 4 and 5. At Step 4, an administrative law judge is instructed by Social Security's own policy rulings not to assess the residual functional capacity in categorical terms. In particular, that's 96-8P. There's also case law that's affirming it, the ruling. And in this case, the administrative law judge found that the claimant is limited to a range of, quote, light, end quote, work, as well as a range of, quote, unskilled, end quote, work. And both of those terms are categorical terms. So we are looking at procedural error. We note that the administrative law judge does not say how long an individual or this particular individual can sit, stand, walk, how much weight she can lift or carry. In addition, he said that the claimant would need a sit-stand option. He doesn't say how frequently that is. Does she have to change her position every three minutes, every five minutes, every 20 minutes, every half hour? We have no idea, because the administrative law judge did not follow the statute and issue a detailed decision that addresses those factors. With respect to the psychological impairment, there's a lot of reliance on factors that predate the date of disability. And that's important in this case, because the record shows that Ms. Yorkspan, she was incarcerated for a period of time, and then upon release had no insurance, had no money. It took her some time to get into treatment. She was homeless. She lived in a shelter. When she got into treatment, she was found to be seriously mentally ill. The evaluators who looked at her on behalf of the administration wasn't given those records. They haven't seen the treatment notes saying she's bipolar, she has trouble with her memory and concentration. She has difficulty sustaining tasks. She's moody. She's irritable. She tried to work, and that's understandable given homelessness and the other factors. And she was unable to sustain any of these jobs. She had lots of fatigue. She would fall asleep at work. These all go hand in hand with that psychological impairment. A couple of factors the judge didn't adequately address, and that is, one, we have what's called the treating physician rule. The judge doesn't set forth clear and convincing reasons for rejecting the opinion of the treating physician. In this case, Dr. Finley indicates that the claimant would not be able to sustain a full eight-hour day, five days a week, on a regular basis. He's treated her over a period of time. He's documented her scoliosis. He's documented her rheumatoid arthritis. There are physical examinations showing edema. There was some hospitalizations. He's had the opportunity to know and observe her. The judge addresses it basically saying two things. One, I find that there's insufficient objective evidence. And the case law says looking at objective evidence is a factor, but once there's objective evidence of an underlying impairment, we have to go beyond that because pain is idiosyncratic and it will affect people different ways. And the question is how it affects Ms. Yorkstan, not how one would expect it to just affect a particular person in general. The administrative law judge also says that he's rejecting the opinion because of a level of activity. The judge doesn't define the level of activity, and each of the notes indicate that it's quite restricted. Her memory and concentration is impaired. She's bipolar. She has good days. She has bad days. The judge found that there was a mood disorder, anger, and outbursts. And the vocational expert testified that if she were to miss even one day a month, she would not be able to perform any of those jobs that the judge found were within her range of work. And the judge just doesn't address those issues. So we're left with a decision that has legal error in it, and that's the point of this appeal. There's also subjective complaints that we don't feel were adequately addressed. OGC indicates that, you know, she's had a drug issue. She's been arrested. All those predate. She did her time. She was released. She was put on probation. There's been no recurrences since 2002. She was 10 months. She was drug tested. She never came up positive. And yet when you look at the drug, the ALJ addressed it and says, I'm not going to find this as negatively impacting her credibility. Yet if you look at the government's brief, they focus on those issues. And we have a judge who says, you know what, based on this record, I'm not going to hold that against her, and it shouldn't be held against her. Her subjective complaints are consistent with the record. She had a global assessed functioning of 38. While incarcerated, she was on suicide watch twice. Her global assessment of functioning had been also 55. I think at one point it was 80. When she was in the higher numbers, she tried to work, and then she would get fired. And that's what we would expect with somebody experiencing a bipolar disorder and having these kinds of deficits. Then at the last step, when they talk about what jobs Ms. Yorkspan could or could not do, there's another procedural error in that the judge does not resolve in his decision conflicts between the testimony of the vocational expert with the provisions of the Dictionary of Occupational Titles. Counsel, let me tell you what's bothering me about the case. Frankly, I'm very sympathetic to your argument, and I'm inclined to think that if I had been the ALJ, I would have granted the disability. I think you're probably correct. However, what the ALJ comes down to is he says, when you look at the nature and extent of the disability, he thinks that she has all the disabilities she claims, but that she somewhat exaggerates the impact, and that those examining physicians who have said that she can't work are relying a lot on what she says, because physicians have to rely on what the patient says. He doesn't think she's entirely honest. Her record, her criminal record, suggests that that may indeed be so. So what I'm wondering is, even though I would have gone the other way, why we don't have to, under the administrative law standard of review, let the ALJ's evaluation stand. Your Honor, an administrative law judge has discretion in determining questions of fact, but he doesn't have the ability to fail to follow procedural requirements. So had the judge given a specific residual functional capacity supported by the evidence? Had he addressed third-party statements, subjective complaints? Has he indicated, yes, we have a treating physician who gives this opinion and set forth valid reasons for rejecting it? I thought he did. His opinion could arguably be clearer, so could many of ours. But it looked to me like that's what he was trying to do. Well, if you look, there is no specific residual functional capacity, and that's important when a judge says, I find that this claimant has anger and outbursts, and then just gives us a conclusion that she could perform what he calls unskilled work. The regulations and the policy rulings state that to do unskilled sedentary work, you have to be able to deal sufficiently with coworkers and supervisors and deal with changes in a routine work setting. Now, the vocational consultant testified if she misses one day per work, she can't do those jobs. And if she is in anger or an outburst at work and tells off a supervisor or something like that were to happen, she's going to get fired. And that's what happened in this case, where she tried to work and she gets fired. It's not unexpected. So it's the evidence. The judge has to tie the evidence in so that when we read the decision, we could figure out what he was thinking. He doesn't address a third-party statement, which is error on its face. He just gives what I call boilerplate language. The opinion is inconsistent with the, quote, objective evidence. What's that mean? What part was inconsistent? If you look at his decision, the only thing he's ---- She manages her funds. She takes her medications. She managed this group home. The bad checks and prescription drug charges don't bolster her credibility. It looks like he is going into it in detail and explaining why he doesn't completely buy the severity. Well, if you look, Your Honor, at step one of the sequential evaluation process, he finds that the managing of the group home did not amount to substantial gainful activity. And the case law explains to us that in individuals who suffer from a bipolar disorder or a mental impairment, we're going to get periods, good periods and bad periods. And they may be able to work during a good period, but they can't work in a bad period. And ---- Thank you, counsel. You have exceeded your time. We'll use some of it with questions. We'll give you a little bit for rebuttal if you want. Thank you. Thank you. Good morning. Shea Bond on behalf of the Commissioner of Social Security. I would first like to address the issue of the sufficiency of the RFC finding in this case. The LJs, contrary to counsel's argument, the RFC finding was specific enough. And when you actually look at the text of the ruling, Social Security ruling 96-8P, it does differentiate between what's required at Step 4 and Step 5 of the sequential evaluation, Step 4 pertaining to past work, Step 5 pertaining to other work. Counsel, let me tell you the areas that are of concern to me from your side of the case. And there really are three main ones. The first is that in rejecting the treating doctor's opinion, there is only the most cursory opaque explanation that there's objective evidence weighing to the contrary. I'm paraphrasing, but it doesn't say why that is more persuasive. The second thing that bothers me is a complete failure to address the new Arizona family records, which showed a GAF of 38 and very severe mental impairments. And that's not dealt with at all, either by itself or in connection with discussing the treating physician. And the third is the complete failure to deal with one of the third-party witnesses. And it seems to me that those, among other things, really, that caused me some difficulty with this ALJ opinion. Yes, Your Honor. I'll try to address those in the order that you brought them up. With regard to the treating physician, Dr. Finley, I would disagree that the analysis, the ALJ's analysis, was cursory. The ALJ did explain that he was rejecting Dr. Finley's opinion, which I would point out is the anomaly opinion in this record. All the other opinion evidence demonstrated that the claimant could actually perform this range of light work, which is consistent with the ALJ's RFC finding. But the ALJ found that the objective evidence didn't support it. And I would say that the ALJ's analysis of the clinical findings, the opinion evidence on the pages leading up to that final conclusion, that Dr. Finley's opinion was unsupported, is the analysis. So the ALJ explained that he was giving greater weight to the opinions of the consultative examiners who basically found relatively unremarkable clinical findings when they were testing her objectively for her complaints of back pain and joint pain that came up. Back pain and joint pain are not the big thing here. It's the bipolar disease that really matters. And there's no blood test or x-ray for that. I understand that, Your Honor. In my explanation. The medication suggests this is one sick puppy. I understand, Your Honor. I was just trying to answer Judge Graber's question in that respect. But it's true that the claimant was diagnosed with a mental impairment and that she was receiving medication. However, there is other evidence in this record demonstrating that she didn't have any limitations beyond that of unskilled work. Well, that's why it seemed important to me, the second of my questions to you, about these records from New Arizona Family that showed a very, very low global assessment of functioning score and, you know, talk about her serious mental illnesses and all of the many problems, both diagnostic and descriptive, that those records show. And the ALJ just never comes to grips with that, in my view. And I just would like your reaction to that. Well, a lot of the evidence also in this case predates the claimant's amended alleged onset date of September 1st, 2005. Now, she did have difficulties prior to that time. And there was the seriously mental ill finding. However, I would point out that no medical doctor made that finding. It was simply a counselor. This report where the counselor determined that she was seriously mentally ill was never countersigned by an acceptable medical source. Well, if the ALJ had written that, we might be able to review it. But what I'm concerned about is that a great many of the arguments in your brief were not things that the ALJ relied on or that we can tell. And so we're limited to what the ALJ actually told us in the decision. And there's nothing like what you've just said in there to say, well, I've discounted it, even though they've described these deep depression and mood swings and angry outbursts and on and on and on. But I'm discounting that because or it's not reliable because. There's just nothing. I would say, Your Honor, that under the case law, the ALJ isn't necessarily required to discuss every piece of evidence that's neither significant or probative. I would argue in this case that in the periods where, say, she was diagnosed as seriously mentally ill or had the low gas scores, that those were for brief periods of time. There's other evidence in the records demonstrating. The nature of the disease is that it comes and goes. I'm sorry, could you repeat that, Your Honor? The nature of the disease is that you have periods of remission, but it never goes away. That is true with bipolar disorder, however, but there's significant evidence in the record that her condition did not deteriorate to the point for the requisite period of time to establish disability that she was unable to perform at least a level of unskilled work. In August of 06, the claimant had a gap score of 70. Two months later, she began working as this manager of the group home. The vocational expert, while this was not substantial gainful activity, it's still evidence of her ability to function mentally. And the VE had characterized that work as actual skilled work. She did that full time, 40 hours a week, for six months. Now, I know that counsel has said that she had or a plaintiff had stated that she couldn't do that work, that she was falling asleep on the job, that she couldn't concentrate, et cetera. But I would submit that the fact that she was performing this work full time for six months weighs against that. Also, before you reach the end of your time period, I'd like you to address the complete absence of dealing with Ms. Davis's third-party report, which is quite detailed and supports the claimant. And it's not mentioned at all, even though that's required to be done. The LG did not mention Ms. Davis's report. That is true, but it's not error in this case. We argue that, first, the report is not competent evidence because for the time period that Ms. Davis was discussing, most of that time period predated the claimant's alleged onset date. So it's during the period of time that the claimant admits that she is not disabled. So what we come down to is that Ms. Davis was describing symptoms during the first two months, during which the claimant was alleging disability. So she does overlap the period of alleged disability, and she describes in great detail what the problems are, including becoming extremely agitated, dealing with other people and inability to make herself bathe, all kinds of things that would bear on her ability to work. Isn't he required to deal with that evidence in some way? I would say in this case, no. And, again, I think because most of the time period she was describing was during the time period that the claimant admitted she was not disabled. Do you have a case or a regulation that says that if a third party gives evidence that overlaps even for two months, the period of disability, the ALJ doesn't have to mention it? Not for that specific proposition, but I would say the Stout case states that the ALJ is required to discuss what's, quote, competent evidence. I would say that this would not necessarily be competent evidence because it's for the two-month period of time. It's based on personal knowledge. Why isn't it competent? It is based on personal knowledge, but it would be only encompassing a two-month period of time during the alleged period of disability.  That's competent. I would say it would not be. To the extent that it's limited, that just bears on how much persuasive force it has. And that would be our second argument, Your Honor, would be that this would be harmless error if the ALJ did not discuss it because it only encompassed this two-month period of time. That's far less than the 12-month consecutive time period that the claimant is required to prove disability. Show me the words in the ALJ's decision addressing the treating physician and how they're adequate. Are you talking about Dr. Finley? Yes. This is page 8 of the ALJ's decision, but page 23 of the administrative record. It's that second paragraph from the top. Alliance Family Health Center? Correct. The ALJ didn't use Dr. Finley by name, but he cited that as Dr. Finley's opinion, and Alliance Family Health is where Dr. Finley was treating. He outlined the opinion, which was for basically less than sedentary, and then concluded that the opinion was given less weight because it was unsupported by the weight of the objective evidence and laboratory findings. And I would point out to this Court that when you actually do The opinions of the consultative physicians that the ALJ did rely on, they all say bipolar disorder, right? They do. And I would just conclude as my time is running out, that when you look at the Alliance Family Health Center records where Dr. Finley was treating, there were barely any objective findings to support his opinion. There really were, when you actually look at those records, there's really no testing of her joints, her muscles, or whatnot, that would support a limitation to less than sedentary. Thank you, counsel. Thank you. Mr. Slepian, I think you used up your time, but we allowed other counsel to go over, and you can have another 30 seconds if you want. Thank you, Your Honor. And it's going to be very brief. I just want to point out that the onset date of disability, it was addressed at the hearing, and what the claimant did is she didn't say she wasn't disabled before September of 2005, but she said to the judge, the overwhelming evidence is that I became disabled, that I was disabled September of 2005, six months prior to the date that I was found seriously mentally ill and had extensive psychiatric treatment from that point. So I want to remind the Court that if you look at the transcript, that's how it's explained of this onset date of disability of September 2005. She was homeless. She had no money. The record shows she couldn't afford treatment. She started getting treatment in January, and she just, I think when she first started, her GAF was somewhere around 50, and then it just got worse. So if you look at the transcript, it explains it. Thank you. The case just argued is submitted. We appreciate the arguments of both parties. We will take a short recess of about 10 minutes or so and return for the remaining cases. All rise.
judges: Beezer, Kleinfeld, Graber